UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CODY GREENE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 3:14-cv-1016 (VLB) |
| | : | |
| THE CITY OF NORWALK, et al., | : | March 21, 2016 |
| | : | |
| Defendants. | : | |

MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART
DEFENDANT OFFICERS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 78]
AND GRANTING THE CITY OF NORWALK'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]

I.   **Introduction**

Plaintiff Cody Greene brings this action against the City of Norwalk

("Norwalk"), and Officers Steven Luciano, Felipe Taborda, Adam Mulkern, and

Julio Rodriguez (collectively, the "Defendant Officers").  He alleges, *inter alia*, that

the Defendant Officers used excessive force under color of law, in violation of the

United States Constitution.  [Dkt. No. 51].  Defendants moved for summary

judgment pursuant to Federal Rule of Civil Procedure 56.  [Dkt. Nos. 78, 79].  For

the reasons that follow, the Defendant Officers' Motion for Summary Judgment

[Dkt. No. 78] is GRANTED-IN-PART and DENIED-IN-PART, and the City Of

Norwalk's Motion for Summary Judgment [Dkt. No. 79] is GRANTED.

II.   **Background**

A.  **Norwalk Police Department Street Team**

The Defendant Officers were assigned to the Norwalk Police Department,

Special Services Unit Street Team (the "Street Team").  [Dkt. No. 78-5 at 38-39].

1

The Street Team was tasked with investigating street level narcotics and gang activities and arresting suspected perpetrators.  The Street Team specifically targeted those areas where [they have] had violence, drug dealing, gang activity, et cetera.  [Dkt. No. 97-2, Kulhawik Dep., at 32].  Street Team members employed "self-initiated stops" rather than answering dispatch radio calls.  [Dkt. No. 78-5 at 65].  Officer Tabora described the Street Team as a "pro-active" unit, and stated that they would patrol areas of the city where there was "an open drug trade or high crime area[] . . . where there has been gang activity, stabbings or shootings, areas where large fights occur through these . . . rival gangs."  [Dkt. No. 78-6 at 37].  If a Street Team officer saw something suspicious taking place, he would "initiate the action, speak with the person."  [Dkt. No. 78-5 at 65].

Defendant Norwalk maintains that the Norwalk Police Department provided extensive training to all of its officers beyond that mandated by the State of Connecticut.  [Dkt. No. 82].  The officers received training in use of force, shooting decisions, taser usage and arrest, and control/officer safety, although Plaintiff maintains that this training was inadequate.  [*Id.*; Dkt. No. 97-1 at 20].  The Norwalk Police Department is an accredited law enforcement agency that has been certified by the Commission on Accreditation for Law Enforcement Agencies ("CALEA") since 1995.  [Dkt. No. 81-13].  In March 2012, the Norwalk Police Department received the "Certificate of Advanced Meritorious Accreditation" from CALEA.  *Id.*

The Norwalk Police Department's internal personnel tracking system suggests that none of the Defendant Officers had, at the time of the Cody Greene

incident, any complaints registered against them.  [Dkt. No. 80-2].  Plaintiff challenges the reliability of this tracking system, arguing that a 2011 report indicated that Officer Luciano had accounted for five percent of all instances of uses of force by the entire department.  [Dkt. No. 97-2, 2011 Use of Force Analysis].  The same report stated that "the Special Services Street Team . . . was tasked with high visibility enforcement in known high incident locations.  The unit made over 150 arrests and therefore came in contact with a much larger number of individuals than most other officers."  *Id.*  It also explained that "[a]s a result of these additional arrests and encounters with potentially violent offenders, a higher than average use of force would be expected."  *Id.*  In 2011, members of the Street Team reported four to five times more instances of uses of force compared to most other officers.  *Id.*  Plaintiff offers no additional facts to support his skepticism of the tracking system's reliability.

Plaintiff faults the City of Norwalk for failing to offer Street Team members additional training to handle these encounters.  [Dkt. No. 87-1 at 25 (citing Dkt. No. 82)].  He argues that by design, Street Team members faced heightened dangers, and that the Norwalk Police Department failed to train members of the Street Team to deal with these heightened dangers.  Plaintiff singles out training on *Terry* stops in particular, arguing that the Norwalk police department dedicated only three power point slides to the issue during a training that was not specifically tailored for Street Team members.  [Dkt. No. 97-2, Exh. 24].  Plaintiff offers no evidence that the general training received by officers together with the training criticized is inadequate.

3

### B. Plaintiff's Arrest

At approximately 8:30 p.m. on July 18, 2012, Plaintiff went to visit a friend who lived at 16 School Street in Norwalk, Connecticut.  [Dkt. No. 51 ¶ 14].  Plaintiff parked on the street and walked up to the building.  [Dkt. No. 97-2, Greene Dep., at 29].  As he was knocking on a door, an unmarked black Ford Expedition with tinted windows pulled up a driveway and four males dressed in black got out of the vehicle.  [*Id.*; Dkt. No. 78-5 at 67].  Defendants dispute this sequence of events, arguing that Mr. Greene began walking quickly toward the apartment building after he saw the car, and tucked something into his waistband.  [Dkt. No. 78-5 at 69].  The Plaintiff maintains that the Defendants could not have seen this because they were behind him when he purportedly tucked something into his waistband.  [Dkt. No. 96-1 ¶ 30; Dkt. No. 96-2, Mulkern Dep., at 69-70; Dkt. No. 96-2, Luciano Dep., at 35; Dkt. No. 96-2, Taborda Dep., at 42].

The parties also dispute whether the Defendant Officers' clothing had any markings identifying them as law enforcement officers.  [Dkt. 96-1 at 5].  Plaintiff has submitted evidence that the four officers were dressed in all black and that there were no markings on their clothing to indicate that they were police officers.  [Dkt. No. 97-2, Greene Dep., at 31-32, 63; Dkt. No. 97-2, Martinez Dep., at 16, 18; Dkt. No. 97-2, Rodriguez Dep., at 7-8].

When the four men got out of the car, Officer Luciano stayed by the car, and the three other Defendant Officers walked up to the Plaintiff.  [Dkt. No. 96-2, Greene Dep., at 33, 37, 77-78].  Officer Mulkern asked the Plaintiff what he was doing at the apartment and who he was there to see.  [Dkt. No. 78-4 at 30; Dkt. No.

4

96-2, Taborda Dep., at 47; Dkt. No. 96-2, Rodriguez Dep., at 48].  **Plaintiff**
**responded that he was there to see his "cousin," who Plaintiff stated in his**
**deposition was Jerrod Smith, a close friend that he referred to as a cousin, but to**
**whom Plaintiff was not related.  [Dkt. No. 78-4 at 31].  Plaintiff claims he then**
**pointed to Mr. Smith and stated, "That's my cousin right there."  [*Id.* at 31].**
**Plaintiff then stated, "My dad is a State Trooper."  [*Id.* at 89].  Plaintiff testified that**
**when questioned by the four men, he was unaware that they were police officers,**
**and that the officers never identified themselves as police officers.  [Dkt. No. 80-8**
**at 84-85].  He further testified that the four men were dressed all in black, and that**
**their clothing had no markings identifying the men as police officers.  [Dkt. No.**
**96-2, Greene Dep., at 31].  A photograph taken of Officer Mulkern later that night**
**showed him wearing a tee shirt which did not have police insignia on the front.**
**[Dkt. No. 78-9].  Plaintiff also testified that he saw that the men were wearing**
**belts, but did not notice that the men were wearing guns or weapons on their**
**belts.  [Dkt. No. 97-2, Greene Dep., at 63; Dkt. No. 80-8 at 35].  Plaintiff testified**
**that none of the officers asked him what he had in his waistband, and none asked**
**to pat him down.  [Dkt. No. 80-8 at 89].**

  **Plaintiff then maintains that the four individuals began speaking with each**
**other, and that he heard someone say something like, "get him" or "grab him"**
**and then one of the men—a white male—grabbed his upper right arm and tried to**
**pull him off of his cousin's stoop.  *Id.* at 32, 92-93.  Plaintiff claims that the**
**individual did not say anything to him when he grabbed his arm, and did not ask**
**him whether he had anything in his waistband.  *Id.* at 32, 89, 93.  Officer Mulkern**

maintains that he told the Plaintiff that he was going to pat him down to look for drugs or weapons, and he testified that he believed Mr. Greene was carrying a weapon.  [Dkt. No. 78-5 at 14; Dkt. No. 81-12 at 95].  Officer Mulkern also testified that he grabbed the back of Plaintiff's shirt after he started to run, ripping a "square" piece of fabric from the back, but that he never grabbed the Plaintiff's arm.  [Dkt. No. 96-2, Mulkern Dep., at 91].

Officer Mulkern cut his leg on a fence or railing immediately after the Plaintiff began to flee from the Defendant Officers.  [Dkt. No. 78-5 at 91].  The parties dispute whether the Defendant was injured while holding onto the Plaintiff or whether he tripped after the Plaintiff escaped his grasp.  [Dkt. No. 96-1 ¶ 59].  A photograph of Officer Mulkern at the Norwalk hospital appears to show this injury, and also depicts body armor with "POLICE" written on it, on the floor beside his bed.  [Dkt. No. 80-9].  No evidence indicates whether this vest belonged to Officer Mulkern, or whether he or any other officer wore it during the pursuit.  In the photograph, Officer Mulkern is wearing a black t-shirt with an Under Armour logo on the chest.  *Id.*  No yellow police lettering or yellow badge is visible on the front of the t-shirt.  *Id.*

Plaintiff then ran from the individuals, describing his route as running up the driveway, left onto School Street, down School Street towards Main Street, "across Main Street through a parking lot, up a driveway, and . . . over a fence down to the ground below going towards Main Street."  *Id.* at 35, 93.  He denied that anyone shouted at him to stop or identified themselves as police officers during the pursuit.  [Dkt. No. 78-4 at 94-95].  Police reports indicate that a woman

named Sonia Suarez later located on the ground near her home a bag containing 28 smaller bags of a green leafy substance later determined to be marijuana, but these reports do not state that Ms. Suarez saw the Plaintiff in possession of or discarding the bag.  [Dkt. Nos. 81-1, 81-8].  The Plaintiff denies ever having possessed this marijuana, or disposing of it during the pursuit.  [Dkt. No. 96-2, Greene Dep., at 64-65].

All four Defendant Officers chased the Plaintiff.  [Dkt. No. 96-2, Rodriguez Dep. at 63].  Officer Rodriguez removed his Taser from his duty belt, and Officer Mulkern drew his gun during the pursuit.  [Dkt. No. 96-2, Rodriguez Dep., at 64-65; Dkt. No. 96-2, Mulkern Dep., at 97, 104].  Plaintiff landed on his feet in mulch after climbing over the fence.  [Dkt. No. 78-4 at 37, 104; Dkt. No. 96-2, Rodriguez Dep., at 63].  A taco truck was located approximately fifteen feet away from the fence.  [Dkt. No. 96-2, A. Martinez Dep., at 20].  An eyewitness waiting in line at the truck, Oviedo Lagos, confirmed that he saw the Plaintiff land on his feet, apparently uninjured.  [Dkt. 96-2, Lagos Dep., at 15].

After Plaintiff climbed over the fence, his left leg started to "go numb . . . kind of a spasm feeling."  [Dkt. No. 80-8 at 38].  Mr. Lagos testified that the Plaintiff was tased, and that he saw the Plaintiff's body lock up.  [Dkt. No. 96-2, Lagos Dep., at 15-16].  The parties agree that Officer Rodriguez discharged his Taser and that one of the Taser darts hit the Plaintiff, but they do not agree on where Officer Rodriguez was standing when this happened.  [Dkt. No. 96-1 ¶¶ 101, 102].

After he was tased, Plaintiff looked toward the fence and saw a white man dressed in all black standing on the other side of the fence, pointing a weapon at him. [Dkt. No. 80-8 at 38-39]. Officer Mulkern confirmed in his deposition that he pointed his gun at the Plaintiff after the Plaintiff went over the fence. [Dkt. No. 96-2, Mulkern Dep., at 97, 104]. Plaintiff states that after he saw the weapon, he got down on his knees and laid on his stomach. [Dkt. No. 80-8 at 38]. Plaintiff did not remember seeing any other individuals dressed in black after his leg went numb. [Dkt. No. 80-8 at 40]. Mr. Lagos testified that it looked like the Plaintiff "collapsed," face forward with his arms in front of him, onto the grass. [Dkt. No. 96-2, Lagos Dep., at 16]. By contrast, Defendants maintain that the Plaintiff only landed on the ground after Officer Luciano tackled the Plaintiff, colliding with him as he continued to run. [Dkt. No. 78-7 at 72; Dkt. No. 78-8 at 59]. Officer Luciano believed that the Plaintiff had already been tased when he tackled the Plaintiff. [Dkt. No. 96-2, Luciano Dep., at 68-69]. Plaintiff testified that he did not remember anything from between the time he got down on his stomach until he woke up in the hospital. [Dkt. No. 80-8 at 40].

A second eyewitness, Alex Martinez, said that he saw the Plaintiff laying down on grass near the fence, and that he saw one officer approach the Plaintiff from behind and a second from the side. [Dkt. No. 96-2, A. Martinez Dep. at 20, 23]. Mr. Lagos testified that two more officers approached the Plaintiff shortly afterward. [Dkt. No. 96-2, Lagos Dep., at 11]. Mr. Lagos further testified that while the Plaintiff was laying immobile on his stomach, an officer walked over to him, turned him onto his back, put both knees on the Plaintiff's shoulders, and started

"punching his face in" using both his fists and elbows.  [Dkt. No. 96-2, Lagos Dep., at 17-18, 49; *see also* Dkt. No. 96-2, A. Martinez Dep., at 31].  Officer Luciano admitted to striking the Plaintiff with a closed fist, but described the hits as resulting from a "struggle" with the Plaintiff.  [Dkt. No. 96-2, Luciano Dep., at 62].  Mr. Lagos also saw that the Plaintiff was bleeding from his face.  [Dkt. No. 96-2, Lagos Dep., at 17-18].  Bystanders yelled at the officers to stop hitting the Plaintiff.  *Id.* at 17.  In response, Officer Mulkern may have pulled up his pants leg to show them the cut on his leg, stating, "You think this guy's good?" and "Look what he did to me."  [Dkt. No. 96-2, Lagos Dep., at 17-18].  Plaintiff's mother took a photograph of the scene of the arrest the day after it took place.  [Dkt. No. 96-2, S. Greene Aff., ¶ 5].  The photograph depicts a copious amount of blood staining the curb next to a grassy area.  *Id.*

After Officer Luciano hit the Plaintiff, he turned the Plaintiff back onto his stomach and Officers Luciano and Taborda handcuffed him.  [Dkt. No. 78-2 at 82; Dkt. No. 96-2, A. Martinez Dep., at 31].  The exact location of Officer Rodriguez while Officer Luciano was hitting the Plaintiff is unclear from the record.  The Plaintiff and Officer Luciano were visible to all of the remaining Defendants during the time the Plaintiff was on the ground.  [Dkt. No. 96-2, Mulkern Dep., at 104; Dkt. No. 96-2, Rodriguez Dep., at 73; Dkt. No. 96-2, Luciano Dep., at 61; Dkt. No. 96-2, Taborda Dep., at 84].  The parties dispute whether or how much the Plaintiff resisted once he was handcuffed.  Defendants claim, and Plaintiff denies, that when Officer Luciano tried to place Greene into custody, Plaintiff was combative and struggled with him.  [Dkt. No. 81-11 at 120-21; Dkt. No. 81-10 at 73;

Dkt. No. 81-9 at 84; Dkt. No. 97-1 at 16]. Officer Luciano never saw a weapon and never found a weapon in Plaintiff's possession or in the vicinity. [Dkt. No. 96-2, Luciano Dep., at 51-53].

A Norwalk Hospital ambulance responded to the scene using lights and sirens, arriving at approximately 8:53 pm. [Dkt. No. 80-6]. Greene was prone on the ground with his hands cuffed behind his back upon the ambulance's arrival. *Id.* An ambulance report documents that Greene was in an "agitated state." Greene was handcuffed to his stretcher in the ambulance, which Defendants attribute to Greene's "combative" behavior. [*Id.*; Dkt. No. 79-2 at 8]. While the ambulance report described Greene as "agitated, combative, kicking and spitting," physician notes used "combative" as part of a description of Plaintiff's diminished brain function following a traumatic brain injury. [Dkt. No. 78-16; Dkt. No. 96-2, Marc L. Rosen Consultation Report, at 26-27]. Mr. Lagos testified that it that when Greene was being placed in the ambulance, he was "screaming that he was in pain and his face and arm really hurt." [Dkt. No. 96-2, Lagos Dep., at 21]. Ambulance personnel were interviewed as part of the Internal Affairs investigation into the matter. [Dkt. No. 81-2]. One of the EMTs, Beatrice Grant, described Greene as "agitated" during the drive to the Hospital. *Id.*

At the hospital, a doctor signed an order authorizing the Plaintiff's physical restraint. [Dkt. No. 80-4]. Hospital records reflect that Greene remained agitated once in the Emergency Room. [Dkt. No. 80-5]. An admission note stated that the Plaintiff exhibited "inappropriate/incomprehensible speech" and "moments of aggressive fighting of all 4 ext. restraints [followed] by episodes of

unresponsiveness." *Id.*  Hospital notes further state that the Plaintiff suffered traumatic brain injury, orbital, maxillary, and mandibular fractures, as well as nasal and septal fractures.  *Id.*  Photographs of the Plaintiff's face on July 20, 2012 show one of the Plaintiff's eyes swollen shut, stitches up the side of his nose, along with dried blood.  [Dkt. No. 96-2, Exh. 17].  Plaintiff also underwent drug testing upon admission to the hospital, which showed that "serum ethanol, salicylate, and Tylenol or acetaminophen levels were all below detectable limits, and that urine toxicology is completely negative . . . for benzodiazepines, cocaine, opiates, cannabis, amphetamines, barbiturates and PCPs."  *Id.*

## III.   Legal Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion."  Fed. R. Civ. P. 56(a).  In order to prevail, the moving party must sustain the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably

11

support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted).  In addition, "the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'  At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir. 1996)).  "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 251).

A court must make the threshold determination of whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.  *Anderson*, 477 U.S. at 250. Judges are not required "to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the

evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.  Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."  *Anderson,* 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872)) (citing *Pennsylvania R. Co. v. Chamberlain,* 288 U.S. 333, 343 (1933); *Coughran v. Bigelow,* 164 U.S. 301, 307 (1896); *Pleasants v. Fant,* 22 Wall. 116, 120–121 (1875)). Indeed, summary judgment should be granted where the evidence is such that it "would require a directed verdict for the moving party."  *Sartor v. Arkansas Gas Corp.*, 321 U.S. 620, 624 (1944).

   "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).  A party may also support their assertion by "showing that the materials cited do not establish the absence . . . of a genuine dispute."  *Id.* Cited documents must consist of either "(1) the affidavit of a witness competent

to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  Local R. Civ. P. 56(a)3; *see also* Fed. R. Civ. P. 56(c)(4).[1]

The Court need not consider any materials that the parties have failed to cite, but may in its discretion consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).  If a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact, the Court may grant summary judgment on the basis of the undisputed facts.  D. Conn. Local R. 56(a)3 (stating that "failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with [Local] Rule 56(a)1 or in the Court imposing sanctions, including . . . an order granting the motion if the undisputed facts show that the movant is entitled to judgment as a matter of law").

IV.   **Discussion**

Plaintiff has brought claims against the Defendant Officers pursuant to 42 U.S.C. § 1983 for violations of his fourth amendment, arguing that he was subjected to an unlawful stop and excessive force in his arrest.  He has also brought state common law claims against the Defendant Officers for malicious abuse of process, assault and battery, and intentional infliction of emotional distress.  He has brought claims against the City of Norwalk under section 1983 and for negligence.

---

[1] Plaintiff asks the Court not to consider two exhibits that it argues lack the indicia of reliability necessary to authenticate them.  [Dkt. No. 96 at 17-21].  These documents only serve to reinforce the existence of factual disputes among the parties.  Their inclusion or exclusion from the record therefore does not affect the Court's decision at summary judgment.

A.  <u>Claims Against the Defendant Officers</u>

1.  <u>Section 1983</u>

Section 1983 provides that "any person who, acting under color of law, 'subjects or causes to be subjected, any Citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws' of the United States shall be liable to the injured party in actions at law."  *Shattuck v. Stratford,* 233 F. Supp. 2d 301, 306 (D. Conn. 2002) (quoting 42 U.S.C. § 1983).  Plaintiff has alleged violations of his rights under the Fourth Amendment under two theories:  (1) the Defendant Officers initiated a *Terry* stop without reasonable suspicion; and (2) the Defendant Officers used excessive force in effecting his arrest.  Plaintiff also asserts a conspiracy claim, and argues that the Defendant Officers are not entitled to qualified immunity.

a.  *Terry* Stop

Myriad material issues of fact prevent the Court from finding that the Defendant Officers' stop was consistent with the Fourth Amendment.  The Fourth Amendment "prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).  In *Terry v. Ohio*, the Supreme Court recognized that police officers may in "appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."

*Terry v. Ohio*, 392 U.S. 1, 22 (1968).  To justify a *Terry* stop, the officer must have "a reasonable basis to think that the person to be detained 'is committing or has committed a criminal offense.'"  *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (quoting *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)).

"A valid *Terry* stop must be 'justified at its inception.'"  *United States v. Lopez*, 321 F. App'x 65, 67 (2d Cir. 2009) (quoting *Terry,* 392 U.S. at 20).  There must be a "particularized and objective basis" for suspicion of legal wrongdoing under the "totality of the circumstances."  *Lopez*, 321 F. App'x at 67 (quoting *Arvizu*, 534 U.S. at 273).  "The standard for determining whether a particular stop was justified by reasonable suspicion is an objective one, not dependent on the intentions or motivations of the particular detaining officers."  *United States v. Glover,* 957 F.2d 1004, 1010 (2d Cir. 1992) (citations omitted).

Here, the Defendant Officers suggest that they believed stopping the Plaintiff was justified, because he was in a residential neighborhood known to feature drug sales, he gazed over his shoulder at their unmarked police vehicle, he adjusted something at his waistband, and he began walking faster.  [Dkt. No. 78-5 at 69].  Plaintiff denies noticing the officers' sports utility vehicle until after he had already reached the apartment building, he denies recognizing this vehicle as being a police vehicle, he denies recognizing any of the officers as police officers, he denies reaching for anything at his waistband, and he questions how the Defendant Officers could have seen him reach toward his waistband while he faced away from them.  [Dkt. No. 96-1 ¶ 30; Dkt. No. 96-2, Mulkern Dep., at 69-70; Dkt. No. 96-2, Luciano Dep., at 35; Dkt. No. 96-2, Taborda Dep., at 42].

16

None of the officers articulated a reasonable basis for their suspicion that the Plaintiff was engaging in or about to engage in a crime.  None of them allege that they noticed a bulge in Plaintiff's waistband, and none observed anything to suggest that the Plaintiff might have been armed, other than that he reached toward his waistband.  The officers do not allege that they were familiar with the Plaintiff or that he had a criminal record of which they were aware prior to stopping him.  In fact the evidence is that at the time of his arrest, the Plaintiff was a 21 year old African American male, who had no criminal record.  [Dkt. No. 78-1; Dkt. No. 78-4 at 5].  Nor do the Defendants allege that anyone reported seeing a person fitting the Plaintiff's description engaging in criminal or even suspicious activity.  The Defendants give no reason why they suspected that the Plaintiff was reaching for a gun or other contraband as he approached the entrance to a residential building as opposed to a key to gain entry to the building.  They do not explain why they did not think he was doing any number of other perfectly benign things such as reaching for a cellphone, pulling up his pants, or putting his hand in his pocket.  The officers do state that they were suspicious because he looked over his shoulder; but they describe the area as a high-crime area, one in which a person would likely be observant of his surroundings.  In addition, the Defendants might have appeared ominous to the Plaintiff.  After all, there were four of them all dressed in black, approaching the Plaintiff from the rear in a black SUV.

It is worth noting that even if the Plaintiff did not dispute that he reached toward his waistband, the Defendant Officers' stop would not have been justified.

17

While "the high-crime nature of the neighborhood" and the "adjustment of a concealed object in [a] waistband," are properly "among the relevant contextual considerations" for a *Terry* stop, *United States v. Padilla*, 548 F.3d 179, 188 (2d Cir. 2008), the Defendants do not cite and the Court is aware of no precedent that has held these two features sufficient in and of themselves. *See, e.g.*, *Padilla*, 548 F.3d at 188-89 (holding that these two circumstances, combined with the fact that the Plaintiff followed a disheveled man apparently on drugs onto a wooded path, justified a *Terry* stop); *United States v. Lucas*, 68 F. App'x 265, 267 (2d Cir. 2003) (holding a stop lawful where the officer observed the appellant "mess around with his waistband" and observed an object that "appeared to be a revolver, handgun or something"); *United States v. Bowden*, 45 F. App'x 61, 62 (2d Cir. 2002) (finding a *Terry* stop reasonable where a suspect reached toward his waistband following an altercation with another man in a parking lot); *United States v. Dorlette*, 706 F. Supp. 2d 290, 303 (D. Conn. 2010) ("The Second Circuit has never held that a suspect's mere digging into pockets can give rise to reasonable suspicion."); *Holeman v. City of New London*, 330 F. Supp. 2d 99, 112 (D. Conn. 2004), *rev'd on other grounds*, 425 F.3d 184 (2d Cir. 2005) (stating that a "general nonspecific aura of suspicion created by the presence of a vehicle in a deserted, high-crime neighborhood did not rise to the standard of reasonable and articulable suspicion necessary to justify a stop.").  The Defendants' proof falls far short of the quantum of proof necessary for summary judgment to enter in their favor on this issue, as there are myriad factual issues for a jury to decide. Accordingly, summary judgment on the *Terry* stop claim is DENIED.

### b. Excessive Force

Claims that law enforcement officers have used excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* Accordingly, a court must examine "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quotations and citations omitted).

The reasonableness of a particular use of force must be judged objectively under the totality of the circumstances and "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*; *see also Jones*, 465 F.3d at 61 ("We are, of course, mindful that the reasonableness inquiry does not allow us to substitute our own viewpoint; we must judge the officer's actions from the perspective of a reasonable officer on the scene."). Furthermore, "[t]he calculus of reasonableness must embody allowance for the

fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396-97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment."  *Id.* at 396 (internal quotation marks and citations omitted).

The Second Circuit clearly requires the personal involvement of an individual defendant in an alleged constitutional deprivation as a "prerequisite to an award of damages under § 1983."  *Farrell v. Burke*, 449 F.3d 479, 484 (2d Cir. 2006) (citing *Wright v. Smith*, 496 F.3d 496, 501 (2d Cir. 1994)).  "A police officer is personally involved in the use of excessive force if he either:  (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so."  *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997)).  "A plaintiff need not establish who among a group of officers, directly participated in the attack and who failed to intervene."  *Id.*  Nevertheless, "[a] police officer cannot be held liable in damages for failure to intercede unless such failure permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights."  *Zainc v. City of Waterbury*, 603 F. Supp. 2d 368, 384 (D. Conn. 2009) (quoting *Ricciuti*, 124 F.3d at 129).

Considering the facts in the light most favorable to the Plaintiff, Officer Luciano's actions clearly constituted excessive force.  First, there are genuine

issues of material fact as to whether the Defendants had a legitimate reason to stop the Plaintiff in the first instance and to pursue him in the second.  Also, both the Plaintiff and an independent eyewitness offered evidence that the Plaintiff had stopped attempting to flee before Officer Luciano began punching and elbowing him in the face.  [Dkt. No. 80-8 at 38; Dkt. No. 96-2, Lagos Dep., at 16].  Finally, the independent eyewitness offered evidence that Officer Luciano repeatedly stuck the Plaintiff in the face and that bystanders implored him to stop.  [Dkt. No. 96-2, Lagos Dep., at 16].  There is considerable evidence that these strikes served no legitimate law enforcement purpose.  Because Officer Luciano has not moved for summary judgment on the Plaintiff's excessive force claim, the Court need only consider whether material factual disputes bar summary judgment as to Officers Mulkern, Rodriguez, and Tabora.

Independent eyewitness testimony places each of these officers at the scene while Officer Luciano was striking the Plaintiff.  And the record contains no evidence to suggest that any of the officers attempted to stop Officer Luciano's attack.  Officer Tabora must have been near enough to the attack to stop it, because it is undisputed that he assisted Officer Luciano in placing handcuffs on the Plaintiff immediately after the incident.  [Dkt. No. 78-2 at 82; Dkt. No. 96-2, A. Martinez Dep., at 31].  Officer Mulkern allegedly yelled at the crowd that he believed the Plaintiff deserved to be hit while it was happening.  [Dkt. No. 96-2, Lagos Dep., at 17-18].  And while the evidence is less clear regarding Officer Rodriguez's location during the assault, the evidence shows that he was at the scene immediately before the assault began.  [Dkt. No. 80-8 at 38].  It is

reasonable to infer that Officer Rodriguez remained on the scene until the arrest had concluded.  Thus, there is sufficient evidence in the record for a reasonable jury to conclude that Officers Mulkern, Rodriguez, and Tabora were each present while Officer Luciano struck the Plaintiff, that each had the ability to intercede on the Plaintiff's behalf, and that each failed to do so.  Their motion for summary judgment with respect to Plaintiff's excessive force claim must therefore be DENIED.

### c.  Conspiracy

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (*citing Carson v. Lewis,* 35 F. Supp. 2d 250, 271 (E.D.N.Y. 1999)). Plaintiff has offered evidence that the Defendant Officers agreed to initiate an unconstitutional stop and to pursue the Plaintiff without identifying themselves as police officers.  Their alleged execution of these acts culminated in Officer Luciano beating the Plaintiff bloody while the remaining officers stood by, causing the Plaintiff severe physical injury and damages.  Plaintiff has therefore raised genuine issues of fact precluding summary judgment on this claim.

### d.  Qualified Immunity

The Defendant Officers further assert that even if Plaintiff's claims under section 1983 otherwise have merit, they are barred by the doctrine of qualified immunity.  Qualified immunity "protects public officials performing discretionary

functions from personal liability in a civil suit for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

To determine whether the qualified immunity defense bars Plaintiffs' claims, the Court must determine (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."[2] *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also Jenkins v. City of N.Y.*, 478 F.3d 76, 87 (2d Cir. 2007).  At step one, the Court must determine whether defendant acted reasonably given the facts and circumstances at play.  *Saucier v. Katz*, 533 U.S. 194, 202-203 (2001).  Because the Court has already determined that a reasonable jury could find the Defendant Officers' stop unlawful, that Officer Luciano used excessive force, and that Officers Mulkern, Tabora, and Rodriguez enabled Officer Luciano's deployment of excessive force, this step is satisfied.

At step two, the Court must determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202.  This inquiry "protect[s] officers from the sometimes hazy border" between lawful and unlawful activity, and "ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful."  *Id*. at 205-06.

---

[2] The two steps of the qualified immunity analysis may be conducted in any order the Court deems appropriate given the facts at hand.  *Pearson*, 555 U.S. at 236.

Step two of the qualified immunity analysis protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

At the summary judgment stage, a Court may not make a qualified immunity determination where "[t]he matter of whether it was reasonable for the officers to believe their actions met the standards set by th[e] legal principles governing defendants' conduct depends on whether one believes their version of the facts," and Defendants' version "is sharply disputed."  *Weyant v. Okst*, 101 F.3d 845, 858 (2d Cir. 1996); *see also Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("Summary judgment on qualified immunity is not appropriate when there are facts in dispute that are material to a determination of reasonableness."); *Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998) ("[S]ummary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain.").  The parties sharply dispute many facts central to whether a reasonable officer would have known that his conduct was unlawful in the situation he confronted.  For example, one factual dispute central to this question is whether the Plaintiff had stopped attempting to flee from the officers before Officer Luciano began striking him in the face.  If he had, a reasonable jury could conclude that Officer Luciano should have known striking the Plaintiff in the face with closed fists and elbows was unlawful.

The Court therefore DENIES the Defendant Officers' Motion for Summary Judgment with respect to Plaintiff's claims under section 1983.

### 2. <u>State Law Claims</u>

#### a. <u>Count Four:  Malicious Abuse of Process</u>

An action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed.  *Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Inv'rs, L.P.*, 260 Conn. 766, 772-73 (2002) (citing *Varga v. Pareles,* 137 Conn. 663, 667 (1951)).  "[T]he gravamen of the action for abuse of process is the use of a legal process . . . against another *primarily* to accomplish a purpose for which it is not designed."  *Suffield Dev. Assocs*, 260 Conn. at 772 (quotations and citations omitted).  Liability is excluded "when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant."  *Id.* at 773.

Plaintiff has not offered evidence sufficient to sustain a claim for malicious abuse of process; evidence of an improper search and excessive force is not alone sufficient to sustain this claim.  *See, e.g.*, *Holeman*, 330 F. Supp. 2d at 121 (holding that where police officers lacked reasonable suspicion justifying a traffic stop, and then unreasonably shot a passenger, the "the record [was] devoid of any evidence establishing that defendants used a legal process for a purpose for which it [was] not designed").  Count Four is therefore DISMISSED.

#### b. <u>Count Seven:  Assault and Battery</u>

"To establish a claim for assault and battery, plaintiff must prove that defendants applied force or violence to her and that the application of force or violence was unlawful."  *Odom v. Matteo*, 772 F. Supp. 2d 377, 395 (D. Conn. 2011)

(quoting *Williams v. Lopes,* 64 F. Supp. 2d 37, 47 (D. Conn. 1999)).  Where genuine issues of fact preclude summary judgment on the Plaintiff's excessive force claim, summary judgment on the common law claim for assault and battery generally must also be denied.  *See, e.g.*, *Nelson v. City of Stamford*, No. 3:09-CV-1690 VLB, 2012 WL 233994, at *9 (D. Conn. Jan. 25, 2012) (denying summary judgment where material factual disputes remain regarding the amount and reasonability of force applied to [the plaintiff] during her arrest"); *Odom*, 772 F. Supp. 2d at 395 (denying summary judgment on assault and battery claims where "there are genuine issues of material fact regarding the reasonableness of [the defendant's] use of force").

As with excessive force, Officer Luciano has not moved for summary judgment on Plaintiff's assault and battery claim.  Plaintiff's excessive force claims against Officers Tabora, Mulkern, and Rodriguez depend largely on their failure to intervene while Officer Luciano struck the Plaintiff.  However, each made what a reasonable jury could conclude was a harmful or offensive contact with the Plaintiff during the pursuit and arrest:  (1) Officer Mulkern grabbed the Plaintiff's arm while he attempted to flee; (2) Officer Rodriguez tased the Plaintiff; and (3) Officer Tabora handcuffed the Plaintiff.  The record contains evidence regarding each of these incidents that would permit a reasonable jury to conclude that any of these contacts was harmful, offensive, and unlawful.  Summary Judgment on Count Seven is therefore DENIED.

### c.  Count Nine:  Intentional Infliction of Emotional Distress

To prevail on an intentional infliction of emotional distress claim, the Plaintiff must demonstrate: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."  *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000) (quotations and citations omitted).  "Liability for intentional infliction of emotional distress requires conduct that exceeds 'all bounds usually tolerated by decent society . . . . '"  *Id.* (quoting *Petyan v. Ellis*, 200 Conn. 243, 254 (1986)).   "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, [']Outrageous!'"  *Morrissey v. Yale Univ.*, 268 Conn. 426, 428 (2004) (quoting *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 443 (2003)).

Plaintiff has offered evidence that the Defendant Officers approached and pursued him without identifying themselves as police officers, and using violent means to try to stop him.  He has further offered evidence that even after he stopped fleeing, Officer Luciano punched and elbowed him in the face so hard that he broke several bones in the Plaintiff's face, gave the Plaintiff a concussion, and caused the Plaintiff to suffer a blackout.  [Dkt. No. 96-2, Ex. 25].  Considered in the light most favorable to the Plaintiff, the remaining officers had the ability and duty to intervene on the Plaintiff's behalf to stop Officer Luciano's assault, but failed to do so.

The Court is confident that Officer Luciano's conduct would cause an average member of the community to exclaim "Outrageous!"—especially because several bystanders effectively did so, when they "started screaming at [Officer Luciano] to stop," [Dkt. No. 96-2, Lagos Dep., at 17]. Moreover, summary judgment is inappropriate where material issues of fact remain regarding what opportunity Officers Tabora, Mulkern, and Rodriguez may have had to intervene to prevent the Plaintiff's injuries. *See Jones v. City of Hartford*, 285 F. Supp. 2d 174, 189-90 (D. Conn. 2003) ("Because there are material issues of fact as to Officers Rodriguez and Nichols and what opportunity they may have had to intervene to prevent Jones's injuries, however, the court leaves the issue of whether the officers intended to inflict emotional distress or knew that emotional distress was the likely outcome of their actions, or whether their failure to intervene was extreme and outrageous to the jury." (quotations omitted)). Summary Judgment on Count Nine is therefore DENIED.

### B. Claims Against the City of Norwalk

The Plaintiff argues that the City of Norwalk should be held responsible for the Defendant Officers' actions, because it failed to adequately train or supervise them. Plaintiff also asserts a negligence claim.

The United States Supreme Court has held that a municipality cannot be held liable on a *respondeat superior* theory for constitutional violations. *Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978). The *Monell* Court held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy

or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is liable under § 1983." *Id.* at 694.  Thus, to hold a municipality liable under 42 U.S.C. § 1983, a plaintiff must prove that the asserted violation of a federally protected right was caused by a municipal policy, a municipal custom or practice, or the decision of a municipal policymaker with final policymaking authority.  *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988).  A plaintiff must further demonstrate that, "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Board of County Commissioners v. Brown,* 520 U.S. 397, 404 (1997) (emphasis in original).  "That is, a plaintiff must show that the municipal action was taken with the requisite culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

"*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir. 2007).  "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell.*" *Id.*  "It follows therefore that a government supervisor who fails to take obvious steps to prevent manifest misconduct is subject to suit under § 1983 in certain, limited circumstances." *Id.*

Plaintiff has offered no admissible evidence sufficient for a jury to hold that a pattern of misconduct existed in this case, that the Defendant Officers were implementing a city policy when they used or enabled excessive force, or that the Defendant Officers were improperly trained.  Instead, the Plaintiff relies largely on expert opinions that were not properly disclosed in this case, as the Court discussed at length in a previous Order.  [*See* Dkt. No. 113].  The Federal Rules of Civil Procedure are designed to permit the parties to conduct discovery with minimal court intervention.  *Cf. Barletta v. Quiros*, No. 3:10-CV-939 AVC, 2011 WL 6260436, at *1 (D. Conn. Dec. 15, 2011) (The Federal Rules "encourage the parties to resolve discovery disputes without court intervention.").  And the sequence and pace of discovery is left to the parties' discretion.  Alan Wright & Arthur R. Miller, et al., 8A Fed. Prac. & Proc. Civ. § 2047 (3d ed.) ("[A]ll parties are allowed to use the discovery devices when and how they choose.").  Plaintiff's disclosure of their "pattern and practice" expert, Michael Levine, on the eve of the close of discovery, via a summary that did not comply with Rule 26(a)(2)(B), did not give the Defendants sufficient notice of his opinions prior to the dispositive motions deadline, and therefore should not be considered.

Without his opinions, Plaintiff has only offered the Court evidence that the Norwalk Police Department utilized a plainclothes police operation whose officers did not respond to calls and occasionally used force during arrests, and who received training comparable to other police officers in Connecticut.  These facts are insufficient to create a genuine issue of fact with respect to the Plaintiff's *Monell* claim, and they cannot support a claim that the City of Norwalk breached

any duty of care.  Plaintiff's claims against the City of Norwalk must therefore be DISMISSED.

V.  <u>Conclusion</u>

For the foregoing reasons, the Defendant Officers' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART and the City of Norwalk's Motion for Summary Judgment is GRANTED.  Counts Four, Five, and Ten of the Amended Complaint [Dkt. No. 51] are DISMISSED.  As the Plaintiff expressly abandoned it, [*see* Dkt. No. 96 at 1 n.1], Count Eight is also DISMISSED.

The Clerk is directed to terminate the City of Norwalk as a party to this action.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  March 21, 2017

31